MEMORANDUM. In the vacation between *December* and *March* terms, *Richard Rush* esquire was appointed attorney-general in the place of *Walter Franklin* esq. who was made President of the courts of Common Pleas in the second Judicial District.

**1811.**

*Philadelphia,*
*Saturday,*
March 30.

## The BANK OF NORTH AMERICA *against* FITZSIMONS.

A judgment not revived by *scire facias* within five years from its date, ceases to be a lien upon real estate, as well against subsequent judgment creditors, as against subsequent purchasers.

THIS cause came before the court upon a case which stated as follows:

At *September* term 1797, judgment was entered in this court at the suit of *Samuel* and *William Hibbert* against *Thomas Fitzsimons* as special bail of *George Green; but no* scire facias *ever issued to revive the said judgment.*

A *scire facias* issued out of the same court returnable to *September* term 1804, at the suit of the President, Directors and Company of the Bank of North America, against the defendant, upon a mortgage made and dated the first day of *February* 1798, and given for payment of 30,000 dollars, loaned by the bank to the said *Thomas Fitzsimons* on condition of the said mortgage being given to secure the payment thereof, but not recorded till the 24th of *December* 1798. Judgment was confessed at the first term; and under

a *levari facias* issued thereon returnable to *December* term 1804, such of the mortgaged premises as are situated in the county of *Philadelphia*, have been sold by the sheriff; and by an agreement signed, the money is to be considered as in court.

At *September* term 1799, *Benjamin Fuller* obtained judgment in the same court against *Thomas Fitzsimons* for a sum of money, which with the accumulated interest exceeds the amount of sales by the sheriff; and on the 20th of *March* 1800 this judgment was revived by a judgment obtained on a *scire facias* issued thereon at the suit of *William Lewis* esq. executor of the last will of *Benjamin Fuller*, against the said *Thomas Fitzsimons*.

On or about the first day of *March* 1801 the President &c. of the Bank of North America had actual notice of the judgment of the said *Samuel* and *William Hibbert*.

The question for the opinion of the court is, whether *Samuel* and *William Hibbert* are intitled to the payment of their said debt out of the amount of the said sales.

It was argued at *December* term 1810 by *Hallowell* and *Ingersoll* for the *Hibberts*, by *Lewis* for *Benjamin Fuller's* estate, and by *Gibson* and *Rawle* for the Bank of North America; it being agreed between the Bank and Mr. *Lewis*, that the court should not settle the question of priority between them, but only as between them and the *Hibberts*.

*Arguments for the Hibberts.* The question depends entirely upon the 1st section of the act of 4th *April* 1798, 4 *St. Laws* 300., which enacts that no judgment then on record in any court within this commonwealth, should continue a lien on the real estate of the defendant, during a longer term than five years from the passing of the act, unless revived by *scire facias*. The language of this section is, it is true, very positive; but notwithstanding this, we contend that by perfectly established rules of construction, this statute does not take away our lien as against these parties.

The case is to be considered under two points of view. 1. As it respects the mortgage more particularly; and we have our lien as against it, because the act was not intended

to alter the relation subsisting between parties at the date of the law; but only to provide for such interfering claims as should arise after the expiration of the five years. 2. As it respects the subsequent judgment, against which also the lien continues, because according to the true spirit and meaning of the act of assembly, the lien ceases only against subsequent *purchasers* without actual notice, but not against subsequent judgment creditors.

1. At the date of the act of 1798, the judgment of the *Hibberts* was a perpetual lien, to which the mortgage of the Bank was as much subject, as if a clause to that effect had been inserted in it by the parties. The act cannot disturb this lien without having an *ex post facto* effect, which would be unconstitutional. It is therefore proper to infer that the legislature did not intend to disturb it. They did not mean to vary the rights of individuals as they existed at the time of the act, but to provide for the safety and convenience of those who should afterwards have occasion to act in relation to the subjects contemplated. Why should the legislature require a *scire facias* for the benefit of those who had notice of the judgment, and took subject to it? Upon the most rigid construction we were not bound to issue a *scire facias* until the 4th of *April* 1803; but why even then, as it respects the mortgagee, or the judgment creditor, when the Bank had *actual* notice as early as *March* 1801, and the creditor constructive notice by fair presumption of law, from the moment our judgment was signed? What is the use of a *scire facias* but to give notice? None. The 3d section, as will be seen hereafter, directs the service of the writ, with no other view but to bring home actual notice to all concerned; and as it respects the mortgagee, here was actual notice independent of the writ.

2. As to the subsequent judgment. The lawmakers had the case of the subsequent purchaser before them, not of the subsequent judgment creditor. The *preamble* is a clear proof of it. It recites that " the provision theretofore made by law for " preventing the risk and inconvenience to *purchasers* of real " estate, by suffering judgments to remain a lien for an inde- " finite length of time, without any process to continue or " revive the same, had not been effectual;" and then it pro-

ceeds to the first enacting clause already mentioned. The third section also proves it; for although very precise instructions are given for the service of the writ upon terretenants, purchasers and the like, yet judgment creditors are not mentioned. The preamble to a statute is the key to open the minds of the makers as to the mischiefs which are intended to be remedied; 6 *Bac.* 380. 386., *Plowd.* 369., 1 *Inst.* 79.; and where the not restraining the generality of the enacting clause will be attended with inconvenience, the preamble shall restrain it; 6 *Bac.* 38., *Ryall* v. *Rolle,* (a) contrary to lord *Cowper's* opinion in *Copeman* v. *Gallant.* (b) Now here unless the enacting clause is restrained by the preamble to the case of *purchasers* only, great inconvenience will follow, and the general intent of the legislature will be defeated. The obvious inconvenience will be this, that after the five years have elapsed, the judgment will not have a lien as against the defendant himself, or persons claiming under a voluntary gift or devise from him; which would be most intolerable. The general intent of the legislature will be defeated, because their object has uniformly been to promote the security of a judgment creditor by confirming his lien, except where it interferes with the circulation of property by embarrassing a fair purchaser. The infallible way to ascertain this intent, is to consider the old law, and the mischief. By the law as it stood before the act of 1798, the lien of a judgment was permanent against all the world. Parties and attorneys were in many cases absent or dead, satisfaction on record could not be obtained where the debt was probably discharged, and satisfactory titles could not be made to purchasers, or they were liable to be surprised by antiquated liens to which their researches had not extended. Hence when the legislature recite the mischief of this old law in the preamble to the act of 1798, they confine themselves to its effect upon purchasers; and by referring to the inefficacy of the provision before made, they shew an intention to provide an additional remedy with precisely the same view with which they had before provided the ineffectual remedy. What was the previous provision? It was the act of frauds

(a) 1 *Atk.* 174. 182. 1 *Ves.* 365.          (b) 1 *P. Wms.* 320.

1811.

BANK
of
N. AMERICA
*v.*
FITZSIMONS.

and perjuries passed in 1772, which enacted that judgments *as against bona fide purchasers* should bind the lands of the defendant only from the time of being signed, instead of relating as at common law to the first day of the term. The view therefore was exclusively the protection of purchasers. The act of 1798 is a mere supplement to the act of frauds. The one prevents the lien from relating back, the other from travelling onward, to the prejudice of this class of individuals; but judgment creditors are not provided for in either, because they suffered no mischief from the common law. The mischief being thus peculiar to purchasers, the remedy should be so applied as to meet it only, and not to affect a case out of the mischief. The intention of the legislature requires that the law should be so limited; and where this intention can be collected from the cause of making the law, or from other circumstances, it should be followed by the judicial magistrate, even though the letter of the statute be thereby violated. 6 *Bac.* 384., *Plowd.* 205., *Litt. Rep.* 212., *Arthur* v. *Bokenham* (*a*), *The King* v. *The Bishop of London* (*b*). In some cases the *letter* of an act of parliament is *restrained* by an equitable construction, in others it is *enlarged*, in others again the construction is *contrary* to the letter. 6 *Bac.* 386-7., *Plowd.* 465. The intention is the only true guide.

There are many instances in which statutes have been held not to apply to cases clearly within their letter, because their spirit and design did not comprehend them. Cases not liable to the inconveniences of the statute of frauds, are not within it. 1 *Eq. Abr.* 19. A purchaser with notice of a judgment which was not docketed according to the statute of *William* and *Mary*, was nevertheless decreed to pay it. *Thomas* v. *Pledwell.* (*c*) No statute law can exclude all equity. 6. *Bac.* 388., 1 *Roll's Rep.* 500., *Winch.* 123., *Sir W. Jones* 39. *Levinz* v. *Will* (*d*) in our own court, is an express authority for the kind of construction we contend for. Although the act says that an unrecorded mortgage shall not be sufficient to pass or grant any estate, yet it was held to be good between the mortgagee and the creditors of the mortgagor.

(*a*) 11 *Mod.* 161.          (*c*) 2 *Eq. Abr.* 684.
(*b*) *Show.* 491.          (*d*) 1 *Dall.* 430.

So in *The Lessee of Henry* v. *Morgan*, (*a*) an unrecorded deed, which the act of 1775 makes void against *any* subsequent purchaser, was held to be good against a subsequent purchaser under a different title. In *Le Neve* v. *Le Neve* (*b*) the agent of the defendant having had full notice of the first articles made on her husband's first marriage, it was held to be notice to her, and a sufficient equity in the plaintiff to postpone the second articles and settlement, notwithstanding they only had been registered according to the register act of 7 *Ann. c.* 20; yet the letter of the enacting clause, unrestrained by the preamble, clearly defeated the first articles. *Chevall* v. *Nichols* (*c*), and *Blades* v. *Blades* (*d*), are to the same point. So is *Pidge* v. *Tyler.* (*e*) In fact by the same rule of construction which has been applied to the disabling statute of 13 *Eliz. c.* 10., making leases which the statute declares to be void, good during the life of the lessor, 1. *Bl. Comm.* 87., 2 *Bl. Comm.* 321., and to the *Stat.* 27 *Hen.* 8, *c.* 16., making a bargain and sale which can pass nothing by the statute for want of inrolment, good against a subsequent purchaser with notice, this court must restrain the enacting clause to the mischief in the preamble, and decide that the lien continues as at common law against the mortgagee, even if he is a purchaser, since he had actual notice, and against the subsequent judgment creditor, because the law did not intend to alter his situation. Such was the opinion of Judge *Washington* in *Hurst* v. *Hurst*, where he decided the very point now in controversy against the same pretensions as those of the bank, and in support of a lien under the same circumstances as those of the *Hibberts.**

(*a*) 2 *Binn.* 497.  (*c*) 2 *Eq. Abr.* 64.  (*e*) 4 *Mass. Rep.* 545.
(*b*) 3 *Atk.* 646. *Ambl.* 436,  (*d*) 1 *Eq. Abr.* 358.

---

* Hurst *v.* Hurst, Circuit Court of the United States, April 1807.

The money brought into court in this case, was claimed by *Hallowell* for the executrix of *William Brownjohn*, who obtained a judgment against the defendant in 1787, upon which several executions had issued up to *March* 1799, but it had never been revived by *scire facias.*

*Rawle contra* claimed on behalf of *Wilson*, a subsequent judgment creditor, relying on the act of 4th. *April* 1798.

1811.

BANK
of
N. AMERICA
v.
FITZSIMONS.

*Arguments for Fuller and the Bank.* The object of the legislature is not correctly apprehended. It was not to extend or to fortify the provisions of the statute of frauds in favour of purchasers, but to complete a system which had been long

WASHINGTON J. This is a case of the first impression, and arising out of a state law. I have only to regret that it has fallen to the lot of this court to give a construction to it, before it had been considered and decided upon by the supreme court of this state. A number of cases have been quoted at the bar, which I do not think entirely applicable to this case; but as they seem to have a bearing upon it, it may be proper to notice them; and in doing so, I shall, to save time, arrange them in classes. They were read in order to prove that the enacting clause of a statute may be construed narrower than the words of it import. The statute of inrolments, 27 *H.* 8., gives rise to the first class. The cases under it prove, that though the statute declared that no estate should pass by bargain and sale unless inrolled in six months, yet that the deed is valid except as to subsequent purchasers without notice. The reason of these decisions is obvious. The plain intention of the law was to remedy certain mischiefs which had resulted from the statute of uses, which, by tolerating secret conveyances unknown to the common law, was productive of inconveniences to those who might afterwards become purchasers of the estate, without knowing of such former conveyances. But if the subsequent purchaser had notice of the prior conveyances, the reason for passing the statute did not apply. It would require great ingenuity to give to these cases a shape which could throw light upon that now under consideration. They decide nothing as to creditors, and they depend upon the peculiar circumstances which produced the law upon which they were founded.

Cases upon the statute of *Elizabeth*, to prevent fraudulent conveyances, form the second class. But it is to be remarked, that this statute extends by express words to creditors as well as to purchasers, who are not bound though they purchase with notice; and the reason is plain. The conveyance is fraudulent, and fraud at common law avoids every act. These cases are therefore still more inapplicable than the former.

The third class relates to leases by ecclesiastical persons for a longer term than three lives or twenty-one years. Such leases were considered as void only against the successors, because they alone were intended to be protected by the clear intention of the legislature. These cases only prove that where the intention of the legislature is plain, that intention will control the positive words of a statute,—a position which is not denied, but which as applied to the present case, is a begging of the question in dispute.

The registry act of *Anne* gives rise to the fourth class of cases. That statute avoids all secret conveyances not registered within a limited time, as to subsequent purchasers and mortgagees for valuable consideration. The cases decide that such deeds, though not registered according to the requisitions of the act, are nevertheless good against purchasers with notice. The reason is, that if they have notice, the conveyance is not a secret one and therefore not within the statute.

Next comes a class of cases more apposite to the present, and which

maturing, whose end was the abridgment of those inconve-
nient liens which the common law of *Pennsylvania* gave to
judgments and to debts. It commenced as early as 1715, by
requiring mortgagees to enter satisfaction, under a penalty,
will deserve more particular notice. I meañ those determined upon the
statute 4 and 5 *W & M. c.* 20., for docketing judgments. It declares that
judgments not docketed shall not affect lands as to purchasers or mort-
gagees, or have a preference against heirs and executors so as to affect
them. So likewise the statute of frauds 29 *C.* 2., declares that judgments
shall be docketed when signed, and that the inrolment of recognisances
shall be set down in the margin of the roll within a fixed time; and that
as to *bona fide purchasers* for valuable consideration, they shall be consi-
dered in law as judgments only from the time they are so set down, and
shall not relate. At common law we know that recognisances when in-
rolled related to the caption, and judgments to the first day of the term.
Let us now examine the decisions that have been made upon this statute.

In *Saunders' Reports* 2d vol. part 1st, p. 9. note 6. it is stated, that that
part of this statute, which respects the lien of judgments on lands, is ap-
plicable only to purchasers and not to judgment creditors, for that pur-
chasers only are protected by the words of the law; that this is the case
even as to that part of the statute which respects goods, which is gene-
ral and does not particularly mention purchasers; and that the law is the
same as to judgments under the statute of *W. & M.* except that as to
heirs and executors in the administration of the estate, judgments not
docketed are considered as simple contract debts. In the case of *Robinson
v. Longe*, 3 *P. W.* 399., it is said that the statute of frauds concerns *pur-
chasers* only and not *creditors*, who remain as at common law. The case
from *Prec. in Chan.* 478., declares in effect the same principle; for a creditor
advancing money on the credit of a judgment, may or will stand in a dif-
ferent situation, from a general judgment creditor, since he may (in
equity) be considered as a *quasi* purchaser or mortgagee.

I come now to consider the statute of frauds of this state, and the state
decisions upon it. This statute passed in 1772, and as to judgments is an
exact copy of the *English* statute of frauds. It enacts &c. (*prout.*)

In *Hooton* v. *Will*, 1 *Dall.* 450., the court were unanimous that a judg-
ment related back so as cut out a domestic attachment, which, it seems
agreed, lays as firm hold of the land as any lien possibly can. In the case
decided in the Common Pleas, no regular judgment was pronounced. In
the case of *Welsh* v. *Murray*, 4 *Dall.* 320., it was decided that the judg-
ment first entered must be first paid, which seems to shew that the court
considered that the statute of frauds of this state respecting the relation
of a judgment applied to judgment creditors as well as to purchasers.

Unless the latter case was decided upon the practice, of which some evi-
dence was given, (and if it were it will prove nothing as to construction,
and will therefore be unimportant in the view which I shall take of this
case) it will be difficult, nor will I attempt to reconcile it with that of
*Hooton* v. *Will*. If the cases are in opposition to each other, I must resort

1811.
_____

BANK
of
N. AMERICA
*v.*
FITZSIMONS.

1 *St. Laws* 115. It appeared again in 1772 in a restriction upon the relation of judgments, and of course upon the extension of liens. 1 *St. Laws* 640. In *April* 1791, it was carried one step further by requiring judgment creditors who to the *English* decisions on a statute precisely similar to that of this state, which it appears confine the statute to the case of purchasers, and do not extend to judgment creditors.

This principle being approved and adopted by this court, we come more immediately to the statute under consideration, where the importance of the principle in assisting the construction of the statute will be pointed out. Let it be premised that a literal and strict construction of the enacting clause cannot be insisted upon. It would be too much to insist that a purchaser with notice of *Brownjohn's* judgment, or that *Hurst* the defendant, could take advantage of the judgment's not having been revived in the mode pointed out by the statute. This would be repugnant to the obvious intention of the law. We must then depart in some measure from the letter of the enacting clause. I admit the soundness of the rule laid down by the opponents of *Brownjohn's* judgment, that the preamble is only to be resorted to in order to explain an ambiguity appearing in the enacting clause. But this preamble is worthy of notice, as it refers us to a former law which this is intended to render more effectual. The latter law has indeed been termed by the counsel for *Wilson* a supplement to the former. The preamble requires us to consider it as such, though being in part unaltered, they might and ought to have been considered together, were the preamble out of the question. The law to which we are thus referred is the act of frauds passed in 1772. Taken in conjunction with the law under consideration, we at once discover the mischief and the remedy, not from the preamble alone, but from that and the enacting clause taken together. What was the old law? That judgments should not relate back or be a lien on lands as against *bona fide* purchasers or mortgagees, but from the time they were signed and inrolled. The mischief which notwithstanding this law still existed, was, that after a great length of time purchasers might find it difficult to discover what judgments were outstanding, so as to affect the land they wished to purchase. The lien extending to all the lands of the debtor, no person could safely know what part he might safely purchase. To remedy this evil the last law requires the judgment creditor within five years to sue out a *sci. fa.* and to give such public notice of its existence that all the world may know what and where the judgment is.

But who are the persons for whom this additional remedy is provided? Surely those in favour of whom the former law had been made, but which was found not to be effectual. To extend the law to other persons would be repugnant not only to the preamble, but to the enacting clause also. If we are to consider the two laws together, which is certainly proper, it would provide a remedy where none was intended. How then do the two laws read taken together? Judgments shall be inrolled at the time they are signed, or they shall not by relation affect a *bona fide* purchaser or mortgagee; and as to *such persons* the lien of the judgment creditor shall

had been satisfied, to enter satisfaction of record. 3 *St. Laws* 96. In 1794 sales by order of orphan's courts were declared to be discharged in the hands of purchasers, from debts of the deceased. 3 *St. Laws* 521, sec. 20, 21. In 1797 debts of an intestate which had before been a permanent lien upon his lands, were expressly deprived of their lien after seven years, unless a certain process was adopted by the creditor. 4 *St. Laws* 155. And finally in 1798 came the law in question, cutting off by the most express language the lien of all judgments unless revived every five years by *scire facias*. 4 *St. Laws* 300. It is clear therefore that the legislature did not in the preamble to the act of 1798, refer only to the provisions in the act of frauds, but to the whole system of provisions, and if to any one part more than to another, to the act of *April* 1791, one of whose sections required satisfaction to be entered upon the record of all judgments which had been paid, not for the sake of purchasers only, but for the

cease, unless the judgment be revived in five years by a *sci. fa.* This reading produces a perfect harmony between the old and the new law. That this was the intention of the law is further manifested from the 3d section of it, which noticing those who may be interested, directs the *sci. fa.* to be served on the debtor or his representatives, his alienee and terretenants. If the judgment creditor had been an object of the law, and intended to be protected by it, why not have directed the writ to have been served on him, who might as easily have been found as the alienee?

I think it not improper to make some general observations on the cases which I before noticed under classes. In not one of them are creditors noticed except in the following instances. 1. Those under the statute of *Elizabeth* against fraudulent conveyances, and in that creditors are specially mentioned. 2. Where the creditor is considered a *quasi* purchaser, as where he advances money on the credit of the judgment, trusting to that as his security without notice of the judgment; *Prec. Chan.* 478.; and that this decision is closely observed, appears from those decisions in equity which establish *even an agreement to sell land* against a judgment creditor, and which prevent a prior judgment creditor from tacking it to a subsequent mortgage, though in the first case the agreement would not prevail against a mortgage, and in the latter a prior mortgagee obtaining a subsequent judgment may tack the latter to the former against an intermediate incumbrancer. *Finch* v. *The Earl of Winchelsea.* 1 *P. Wms.* 278., 2 *Vez.* 622-3. The reason is plain. The judgment though a lien is not a *specific* lien on the land; that is, the creditor did not go on the security of the land, but trusted to the general credit of the debtor and of his estate.

I am therefore of opinion that the judgment of *Brownjohn* must prevail against the other judgment creditors.

1811.

BANK
of
N. AMERICA
v.
FITZSIMONS.

sake of defendants themselves; and it being found that satis-faction could not be entered in many cases, the intention was to supersede this form by taking away the lien.

By this construction all parts of the law harmonize. The title itself shews it to be an act of limitation. " An act limi-" ting the time during which judgments shall be a lien on real " estate" &c. The preamble, by reciting that the provisions made by law for preventing risk and inconvenience to purchasers had not been effectual, does not mean merely that they had not been effectual for purchasers, but effectual for all necessary purposes whether concerning purchasers or other persons; as in case of a sale under execution, not only purchasers were embarrassed, but it was impossible to know to which judgment creditor the proceeds should go, while so many antiquated judgments were upon the docket. And then comes the enacting clause, free from the least ambiguity or obscurity, that no judgment shall remain a lien for a longer term than five years, unless revived by *scire facias*. It is not surprising then that the arguments should not apply, and that even the decision of judge *Washington* should be erroneous, when the object of the law has been mistaken. Notice was not the thing required. Judgments were often known, when the plaintiff and his attorney were dead, and the debt discharged. They nevertheless impeded public sales. They called for vexatious inquiries. They were sometimes kept open by fraud, to guard a defendant against a younger judgment. They imposed upon every purchaser at sheriff's sale the necessity of examining the records of the court to their very origin. And hence the legislature required every five years the most decisive evidence that the judgment was unsatisfied and in force, by demanding its revival after full notice to all concerned. A main object was to limit the searches of conveyancers to five years.

But it is said that the preamble, since it speaks of *purchasers* only, must be held to restrain the enacting clause. The very authority cited shews that the particular words of the preamble never are permitted to restrain the generality of the enacting clause, unless there are other weighty reasons.

The preamble is no more than a recital of some inconveniences, which does not exclude others. 6 *Bac.* 381. If part of

a statute is obscure, it is to be elucidated by other parts, and restrained or enlarged according to necessity. But the mere particularity of the preamble is no guide. To say that inconvenience will result from not restraining the enacting clause, is begging the question. The legislature as has been shewn, intended it to be general. If not, why omit the words, " *as against purchasers*" which had been inserted in the act of frauds? There are many cases where the enacting clause goes beyond the preamble; so many indeed that the preamble can scarcely be called a key to the legislative intention. Where the law is plain, the legislature must be intended to mean what they have expressed. *United States* v. *Blight.* (a) It would be a precedent full of danger, if in such a case as this, the preamble were to overturn the enacting clause.

This argument is also an answer to the objection that the law intended to leave all parties in the relation they bore at its date, and only to affect cases arising at the end of five years. It does not say so. The language is clear to the contrary. *No* judgment *then* on record, was to retain its ien more than five years, unless revived. In fact the objection recoils upon the *Hibberts.* The circumstance of comprehending all judgments past and to come, shews that notice was not the object. They were all within one common mischief, that of embarrassing creditors as well as purchasers.

None of the cases cited support the argument of the opposite counsel. They arise under 1. The statute of inrolment, 27 *H.* 8. *c.* 16. 2. The statutes relative to church leases. 3. The statute of 27 *Eliz. c.* 4. 4. The registering acts, or 5. The docketing act of *William & Mary.*

1. The statute of inrolments resembles this more than any other, because it does not mention the class of persons to be affected, but enacts that a bargain and sale without inrolment shall not pass any estate. And so it has uniformly been held against all parties. It is not conceded that under the statute 27 *H. c.* 16. deeds not inrolled are valid against purchasers with notice. By inrolment they no doubt have relation to the date. 1 *Com. Dig.* 541 *D.* But if *A* bargains and

(a) 2 *Cranch.* 399.

1811.

BANK
of
N. AMERICA
v.
FITZSIMONS.

sells to *B*, and they grant a rent to *C*, if there is no inrol-ment in six months, it is the grant of *A* and the confirmation of *B*. 1 *Inst*. 147 *b*. Without inrolment nothing passes. *Moor* 34. *pl*. 113. 40. *pl*. 128. The bargainee cannot distrain for damage feasant. *Saville* 91. He is not a good tenant to the præcipe. *Hobart* 261. *Robinson* v. *Comyns*. (*a*) He cannot maintain waste. *Hynde's case*. (*b*) He cannot support an ejectment. 2 *Roll's Rep*. 119, 120. If either pleadings or special verdict set out the bargain and sale without an inrolment, it must be held that nothing passed; so that the conveyance is void at law. *Yelv*. 217., 2 *Saund*. 11, 12., *Hob*. 262. If in any case equity steps in, it is only where a subsequent purchaser has notice of the deed, and then it is a fraud in him to oppose the bargain and sale for want of inrolment, and to endeavour to defeat the bargainee. But what emphatically differs this kind of case from the present, is the notoriety of the fact that the 27th *Hen*. 8. c. 16. was passed solely to guard against the mischiefs of secret conveyances which were likely to result from the statute of uses passed in the same session. Notice therefore was its only object.

2. The statutes relative to church leases, 13 *Eliz*. c. 10., and 18 *Eliz*. c. 12. The objects of these statutes was to prevent frauds against the *successors* of ecclesiastical persons. The title of the first and its two first sections most distinctly shew it; the other statute proceeds upon the same ground, and with the same view. Hence the restriction of the remedy to the mischief. To have allowed the lease to be defeated during the life of the lessor, would have made the statutes an inducement to fraud.

3. The statute against fraudulent and covinous conveyances, 27 *Eliz*. c. 4., was made expressly for the protection of purchasers. And being so, whether they have notice or not is immaterial. The conveyances are equally void. 1 *Fonbl*. 268.

4. The registering acts 2 & 3 *Ann*. c. 4., 6 *Ann*. c. 35., 7 *Ann*. c. 20., 8 *Geo*. 2. c. 6., by their enacting clauses make unregistered deeds void as against subsequent purchasers and mortgagees for a valuable consideration. The exclusive ob-

(*a*) *Cas. Temp. Talb*. 167.          (*b*) 4 *Rep*. 71.

ject of these acts was notice; but notwithstanding this, it is on the ground of fraud that equity makes the unregistered deed good against the subsequent purchaser. *Chevall* v. *Nichols*, and *Blades* v. *Blades* were cases in which the second purchaser was postponed in equity on the ground of fraud. It is a fraud in a second purchaser, having notice of a prior unregistered deed, to register his deed first. *Worsley* v. *Demattos*. (a) But in our case there is no pretence of fraud, or even of taking any advantage of the *Hibberts*.

5. The docketing act of 4 & 5 *W. & M. c.* 20. was also made exclusively for the benefit of purchasers and mortgagees, and its object was notice. Yet still equity inforces a judgment not docketed as against a subsequent purchaser, only on the ground of fraud. *Thomas* v. *Pledwell* was a case in which the purchaser had been expressly allowed for the judgment which he endeavoured to defeat.

There is no case which is an authority for postponing us to the first judgment under such a law as this. In fact as it respects the mortgage we are within the preamble as *purchasers*. *Chapman* v. *Staverton* (b), *Gilb. Lex Præt.* 230. *Finch* v. *Earl of Winchelsea* (c), *Brace* v. *the Dutchess of Marlborough* (d), *Anon.* 2 *Ves.* 662. *Taylor* v. *Wheeler* (e). And indeed in equity any man who trusts his money upon the lien of a judgment is in some sort a purchaser. *Prec. in Chan.* 478. In *Levinz* v. *Will* it was conceded by counsel, that if any one had obtained a judgment *bona fide*, it would have been preferred to the unrecorded mortgage.

*Cur. adv. vult.*

On this day the judges delivered their opinions, as follows:

TILGHMAN C. J. The money brought into court in this case, is claimed by three different parties; by *Samuel* and *William Hibbert*, by the Bank of North America, and by *William Lewis* executor of *Benjamin Fuller* deceased. But the question submitted to the court is, whether the *Hibberts* are intitled to the payment of their debt. The Bank and the executor of *Fuller* do not wish to have it decided which

1811.

BANK
of
N. AMERICA
*v.*
FITZSIMONS.

(a) 1 *Burr.* 474.  (c) 1 *P. Wms.* 277.  (e) 2 *Vern.* 564.
(b) *Cowp.* 280.  (d) 2 *P. Wms.* 491.

1811.

BANK
of
N. AMERICA
*v.*
FITZSIMONS.

of them is intitled to the preference. It will be sufficient, therefore, to consider, how the case stands between the *Hibberts*, and the executor of *Fuller*. This will depend on a single point, that is to say, whether the provision in the first section of the act of 4th *April* 1798, limiting the lien on real estate, of judgments *then* in existence, to the term of five years from the passing of the act, is to be confined to the case of *purchasers*, or operates also in favour of *judgment creditors*.

The act is intitled " an act *limiting* the time during which " judgments shall be a lien on real estate, and suits may be " brought against the securities of public officers." The preamble recites, that " the provision heretofore made by law " for preventing the risk and inconvenience to purchasers " of real estate, by suffering judgments to remain a lien for " an indefinite length of time, without any process to con- " tinue or revive them, had not been effectual." By the first section it is enacted, that no judgment *then* on record, should continue a lien on the real estate of the defendants, during a longer term than five years from the passing of the act, unless revived by *sci. fa.* within the said five years. The second section enacts, that no judgment to be *thereafter* entered in any court of record, should continue a lien for a longer term than five years from the first return day of the term of which it was entered, unless revived by *sci. fa.* within the said five years. The third section points out the mode in which the *sci. fa.* shall be served.

The plaintiff's counsel contend that the preamble of the act shews, that purchasers only were in the contemplation of the legislature, and therefore none but purchasers shall derive any benefit from it. In support of this construction a number of cases were cited, establishing principles of which it will be necessary to take notice. The cases may be reduced to the following heads. 1st. Rules for the construction of statutes. 2d. Leases made by ecclesiastical persons. 3d. The statute of inrolments, 27 *Henry* 8. *c.* 16. 4th. The statutes concerning the registering of conveyances of real estate.

As to the construction of statutes, it is certain they are not always to be construed according to the *letter*. General expressions may be restrained, where it clearly appears from the whole law, that it was the intention of the legisla-

ture to provide a remedy only for particular cases. Upon this principle the cases which relate to leases made by ecclesiastical persons turned. The statute 13 *Eliz. c.* 10. *s.* 3., provides, that all leases &c. for more than twenty-one years or three lives shall be utterly void and of no effect, to all intents constructions and purposes. Yet it has been held, that such leases were good during the lives of the persons by whom they were made, because it was the intent of the legislature only to protect the *successors* of such ecclesiastical persons. To bring those cases to bear on the point in question, it must be shewn, that it was the clear intent of the legislature to confine the remedy against the lien of judgments, to purchasers of real estate.

The cases on the statute of inrolments, and on the registering acts, may be considered in the same point of view, as they depend on one and the same principle. By the statute of inrolments, no estate of freehold or inheritance, or any use thereof, shall pass by deed of bargain and sale, unless the deed is recorded in six months from the date. By the registering acts, deeds not registered according to the provisions of the several acts, shall be adjudged fraudulent and void, against any subsequent purchaser or mortgagee for valuable consideration, unless such prior deeds are registered before the registering of the deeds under which such subsequent purchasers or mortgagees claim. Now it is settled that if a purchaser neglects to inrol or register his deed according to the provisions of these statutes, yet his title shall be established, in equity, against a subsequent purchaser who at the time of his purchase had notice of the prior uninrolled or unregistered deed. The reason is, that those statutes were made for the protection of purchasers against secret conveyances, and therefore purchasers *with notice*, are not within the mischief intended to be remedied. Besides, such purchasers do not act fairly, and it is principally on the ground of *fraud*, that courts of equity interfere in such cases. It is a fraud for a man who has sold land, to endeavour to circumvent the purchaser and deprive him of his property, because he has been so negligent as not to inrol his deed; and it is fraud for any third person to aid the seller in this circumvention, by making a subsequent purchase. Such subsequent purchaser cannot be called a *bona fide* pur-

chaser, though he pays the full value of the land. On the contrary he acts *mala fide*, because he is party to a transaction by which his neighbour is defrauded. Such are the sentiments of lord *Hardwicke* in *Le Neve* v *Le Neve*, *Ambler* 446, and the good sense of them is manifest. The plaintiff therefore can make no application of these cases, unless he shews, that the youngest judgment creditor has acted fraudulently towards the eldest.

I will now consider more particularly the act of assembly on which the question arises, for after all it is that which must govern us. From its title it appears to be intended as an act of *limitation*, and that I take to be its true meaning. I cannot agree with the plaintiff's counsel, that the only object was, to prevent the injury which *purchasers* might receive from judgments of which they had *no notice*, because all judgments are of record, and every man may obtain information of them. But the lien of old judgments produced great inconvenience to persons who *had notice* of them. In many cases the plaintiffs had been long dead, or lived at a great distance, and although part, or the whole of the debt had been paid, this did not appear on the record. The mischief was not confined to purchasers of the real estate bound by the judgment; and that is a very material consideration in investigating the intent of the legislature. It has been a practice of long standing in this state, when the sheriff sells land by virtue of an execution, to sell it for its *full value* without regard to the lien of judgments, and to apply the purchase money to the discharge of those liens, according to their order. Now great difficulty arose in discharging those liens, for the reasons which I have mentioned. The consequence was, that the sheriff retained the money in his hands till he could ascertain the amount of old judgments, and this was a great injury to judgment creditors in general, as well as a great embarrassment to sheriffs who wished to act honestly, and pay away the money as quickly as possible. The title of the act of assembly is calculated to prevent these mischiefs, and so is the enacting part of the first and second sections. Nothing can be more general or more plain, than the expressions in these sections: " no judgment shall continue " a lien on real estate during a longer term than five years,

unless revived by *scire facias.*" Why then are these general
words to be restricted to the case of purchasers? Because, it
is answered, the preamble makes no mention of inconveni-
ence to any but purchasers. I am not satisfied with this rea-
son. The intention must be clear to authorize the restraining
of the enacting clauses. I cannot say that the intent is clear,
when I find the title more comprehensive than the preamble,
and when we all know that nothing is more common than to
*recite* a particular mischief, and to *provide* remedies for other
mischiefs. Will any inconvenience result from construing
the general expressions according to their natural import?
No, but on the contrary it will promote the public conveni-
ence. It may be remarked, that this preamble which is so
much relied on, is expressed in very vague terms. It speaks
of former provisions by law, in favour of purchasers, which
had proved ineffectual, but does not point out what those
provisions were, or in what laws they were contained. The
plaintiff's counsel suppose that the former provision alluded
to, was made by the act for prevention of frauds and perju-
ries, 21st *March* 1772, 1 *St. Laws* 640, by which, judgments
*as against purchasers bona fide for valuable consideration* do
not bind lands, but from the time of their being *signed;* in-
deed it has been contended, that the act upon which the
question before us arises, is to be considered in the nature
of a supplement to the act of frauds and perjuries. This is
carrying the matter too far. When the act in question was
made, no doubt there was an eye to the act of frauds and
perjuries, and one of my reasons for thinking that the pro-
visions in the former were not intended to be confined to pur-
chasers, is, that the enacting clauses do not so confine it, where-
as the act of frauds and perjuries is expressly restrained *to
purchasers bona fide for valuable consideration.* But the act of
frauds and perjuries does not appear to be the only one alluded
to, in the preamble of the act in question. A provision was made
by the act of 19th *April* 1794, that purchasers of lands sold
by order of Orphan's Courts, should hold them discharged
from liens, and all debts of the intestate, judgments inclu-
ded. By the act of 4th *April* 1797, debts due from deceased
persons (other than debts of record) are not to remain a lien
on lands for more than seven years from the decease of the

1811.

BANK
of
N. AMERICA
*v.*
FITZSIMONS.

debtor, unless certain things are done which are specified in the act. Though this last act does not relate to judgments, yet it serves to shew, in connexion with others, that the current of legislative opinion has been for some years against long continued liens on real estate, from an experience of their inconvenience.

Now to bring these observations to a point, we are considering an act of assembly, of which there are two modes of construction. One agreeing with the plain and natural meaning of the enacting words, and the intent expressed in the title, going *beyond*, but not *contradicting* the recital in the preamble, and at the same time the best calculated to promote the public convenience; the other, contrary to the common meaning, and restraining the import of the general expressions of the enacting clauses, in order to comply with the supposed intent manifested in the preamble. I prefer the former construction, and I have considered it fully, not only on account of the importance of the subject, but from my high respect to the Circuit Court of the *United States* for this district, who have entertained a contrary opinion. I shall always differ from that court with great regret, and particularly in cases which arise on the construction of our own acts of assembly, because there is no superior tribunal by which the law may be settled.

, My opinion is that *Samuel* and *William Hibbert* are not intitled to any part of the money.

YEATES J. gave no opinion, being interested as a stockholder in the Bank of North America.

BRACKENRIDGE J. " An act limiting the time during " which judgments shall be a lien on real estate," is that part of the title of the act of the 4th *April* 1798, which respects the present question. The preamble states, " That whereas the " provision heretofore made by law for preventing the risk " and inconvenience to purchasers of real estate, by suffering " judgments to remain a lien for an indefinite length of time " without any process to continue or revive the same, hath not " been effectual, therefore," &c. We are led to inquire, what provision had been made by law in this particular? I find nothing in the act of 1772, intitled an act for the prevention

1811.

BANK
of
N. AMERICA
v.
FITZSIMONS.

of frauds &c., that has any relation to the *duration of the lien of a judgment*, but only to the taking away *the fiction of relation*, " to the first day of the term at which it was entered, " or return of the original, or filing of the bail." The law of 13th *April* 1791, 3 *St. Laws* 96. *sec.* 14., which has been cited, introduces no limitation of a judgment; but, by the preamble to the section, we discover the mind of the legislature, on the *mischief* of judgments continuing a lien an indefinite length of time: that " whereas it frequently happens, that judgments " long remain *unsatisfied* on record, although the *moneys for* " *which these judgments have been rendered are justly dis-* " *charged*, whereby defendants in such case, as well as the " subsequent *purchasers* of real property, suffer much vexa- " tion, and inconvenience, be it enacted," &c. The provision, under this law, regards the compelling the judgment creditor, at the request of the defendant, to enter satisfaction within eighty days after request made, under penalty of paying " any sum of money, not exceeding one half of the " debt or damages" in the judgment.

This is the only provision made by law in the case, before the act in question, to the construction of which we now come.

To what purchasers shall it be considered as relating? Shall it be to all that acquire an interest in the real estate, whether *absolute* or *special?* Is not the one as much a purchaser as the other, though he does not acquire the same interest? A judgment creditor has trusted his money, or money's worth, and obtained this security. The judgment not being satisfied, he proceeds to carry his *purchase*, as it may be called, into effect. Indefinite as to extent in the case of a judgment, it is rendered definite by a levy. The sale by the sheriff, the agent of the law for both debtor and creditor, in the case of a mortgage or judgment, is for the use of the creditor; and the deed by the sheriff completes the transfer of a property vested in equity before for his use.

In the case of the mortgagee, or subsequent judgment creditor, I am not able to see the application of the argument relative *to notice*. The record of the prior judgment is a lien; and notice or not notice, binds. An interest is acquired by the subsequent alienee, mortgagee, or judgment creditor; but

subject to the prior judgment, whether this alienee mortgagee or judgment creditor knows of the prior lien, or does not know of it. If actual notice could be more than constructive here, how shall it be established? By a copy of the docket entry served upon the party? But there can be no party prior to the acquiring an interest; and after acquired, it cannot affect. Constructive notice bound before, as much as actual notice, were it proved. But actual notice that it *was not satisfied*, is the notice spoken of. This, the record of a judgment, without satisfaction entered, of itself imports. It would introduce a new chapter on the subject of notice, that a judgment was not satisfied, which it purports not to be, until the contrary appears. But it will be said, the owner of the subsequent lien may acknowledge that he knew the former was not satisfied: and what then? There was no *dolus malus* in him in taking his lien subject, as by the law it was, to the prior. The *caveat emptor* lies upon the purchaser, and he is subject to the *inconvenience* of finding out what liens are of record, and the risk of not discovering all; and without the intervention of an act of the legislature, he was subject to the lien, whether he discovered it or not; but in his research it would be his misfortune not to have discovered it.

This brings us to the question, has the act of assembly exonerated the property? Can the legislature be supposed to have intended a dissolution of the lien, so as to exonerate from the prior incumbrance? Will it not be sufficient to construe it as extending to alienations or incumbrances, posterior to the five years? Say a mortgage or a judgment after the five years and before the alienation contemplated, how will it stand with a mortgage or judgment immediately preceding the five years? Will that be subject to judgment No. 1? No. But it will be subject to judgment No. 2, five years not having elapsed on that judgment. But can judgment No. 2 be discharged without discharging No. 1 subject to which it was taken? The argument for *Hibbert* must say no. Then if No. 3, after the five years, is subject to No. 2; and No. 2 is subject to No. 1, No. 3 is subject to No. 1. Exoneration from one, and not the other, is like the *Welsh* carrier mounting his beast, and taking the cheese upon his own back to lighten the bur-

then. It involves an inconsistency to suppose that the act can look forward only to incumbrances posterior to the five years; and what is there then, in supposing the legislature to intend a limitation to the duration of the lien, and an exoneration of the property to all intents and purposes, more than in any other act for quieting possessions, and limiting the pursuit of titles? A principle of the artificial system of the law gave the lien, and the law may think proper to dissolve it. *Omne solvitur eo ligamine quo ligatur.*

This statute has a retrospective effect, it is true; but there seems to be no constitutional objection justly founded, to the power of the legislature to enjoin such conditions, as may let in the rights of others, whether by accelerating the obtaining satisfaction, or getting an entry of satisfaction made upon the record so that the preceding lien may be out of the way. It is the language of the law, satisfy yourself, or say you are satisfied, that another may come in. Why stand in his way that he cannot tell what to do? *Sic utere tuo, ut alienum non lædas.*

In order to comprehend the meaning of this act we must look, as I have said, to the law to which it refers; and which is not the act of 1772, which respects the *relation* of a judgment and nothing more, but the act immediately preceding on this subject, the act of 1791. At common law if a judgment sleep *post annum et diem*, it is necessary to revive it by a *scire facias*, before an execution can issue. This, on the presumption that it is satisfied. By the present act, if a judgment sleep five years, the presumption is considered as arising of its being satisfied, so far as to exonerate the lien, though it does not annihilate the debt. It still leaves to this a right of recovery, but not as a lien on the real estate. It is impossible that the words of the act can be broader, or embrace more extensively. " No " judgment *now* on record in any court within this com-" monwealth, shall continue a lien on the real estate, unless" &c. And section 2, " No judgment *hereafter* entered in any " court of record shall continue a lien on the real estate, " unless" &c.

But why the *scire facias*, served, as provided in sec. 3, " on " the terretenants or persons occupying the real estates bound

1811.

Bank
of
N. America
*v.*
Fitzsimons.

" by the judgment, and also, where he or they can be found, " on the defendant or defendants, his or their feoffee or " feoffees, or on the heirs, executors, or administrators of " such defendant or defendants, his or their feoffee or feof- " fees; and where the land or estate is not in the immediate " occupation of any person, and the defendant or defendants, " his or their feoffee or feoffees, or their heirs, executors, " or administrators cannot be found, proclamation shall be " made," &c.? Unless sufficient cause to prevent the same is shewn at or before the second term subsequent to the issuing of such writ, the court shall direct and order the revival of any such judgment during another period of five years, and so *toties quoties.* Why this? I answer: The object of this act was to get the docket cleared or kept down as to the list of judgments which a purchaser must inspect; and as to which being satisfied or not satisfied, he must inquire. It awakened debtors, for *their own sakes,* to have satisfaction entered, which in the case of the loss of evidence might not be easy to make out; especially in the case of executors and administrators, who were embarrassed by the claims of priority of lien; for the sake also of those deriving title under the debtor, by alienation from himself immediately, and who were interested in having satisfaction entered on judgments of which they might not have been aware, or which had been represented to them as having been in fact satisfied. It facilitated to a debtor the compelling the entering satisfaction in his favour, by rendering it penal to the creditor himself, to the extent of the loss of the whole of his lien. But a principal and leading object was *for the sake of the judgment creditors, as between themselves.*

A precise view of the mischiefs that existed before this statute in the case of the lien of a judgment, will be the best exposition of its object, and the extent of its application. A creditor who had a judgment in his favour, say No. 2, was delayed by No. 1 not proceeding to a levy, or sale, so as to ascertain the effect of his lien, and leave the subsequent judgment open to his proceeding. For if he proceeded, a sale under his judgment must be subject to the prior judgment which was perhaps satisfied, but did not appear to be so.

It was not an uncommon thing, that by collusion of cre-

ditor No. 1 with the defendant, this judgment was kept open, notwithstanding satisfaction before actually made; and on a sale under the judgment No. 2, it was brought in, and the debt claimed. A defendant having become *insolvent*, could serve himself by a fraud of this kind. He could say to the judgment creditor No. 1, claim your judgment which I will not call upon you to acknowledge satisfied, and which I will not allege has been satisfied. Claim your debt, or do not come forward to enter satisfaction, that at the sale under it, or under No. 2, subject to it, a friend of mine may purchase *for my use*. But laying this out of the case, the judgment creditor knowing nothing of the fraud, his judgment may answer the purpose of depreciating the sale of the property; and without the knowledge of either creditor or debtor, this use has been made of outstanding judgments by *speculators* at the sheriff's sale, by which means the judgment creditors are defrauded, the property not bringing the real value. What was more common than for speculators in this way to buy up a prior lien satisfied in whole or in part, to make this use of it, and get the property at an under value, which could not have been done if the judgments had been cleared away that were actually satisfied, though apparently existing.

There is an air of vexation in the preamble of this act, at the finding it necessary to make any other provisions than those already made. Would it not justify a greater irritation of the public mind, if by a restrained construction of the word *purchaser* in the preamble, the broad provisions of even this act were defeated?

I can therefore have no doubt, that even as respects judgment creditors, with relation to liens between themselves, the prior judgment not revived according to the act, loses its priority. But here as between the prior judgment and the mortgage, which it is not denied comes in strictness under the denomination of a purchase, the argument can only be on the ground of notice, which the mortgagee will and must admit he had. And what then? It cannot affect. If it could be made a consideration, it is not the notice of the lien, but of the *non satisfaction*, that could affect; and this is the ground of the whole mistake in the argument on the point

1811.

BANK
of
N. AMERICA
*v.*
FITZSIMONS.

BANK
of
N. AMERICA
. v.
FITZSIMONS.

of notice. But even did he know that the prior judgment was not satisfied, it interferes with the policy of the law to relieve him against it. I must therefore be of opinion that *Samuel* and *William Hibbert* are not intitled *to the payment of their debt out of the amount of the sales under the mortgage.*